TIMOTHY R.E. KEENEY, COMMISSIONER OF ENVIRON-MENTAL PROTECTION *v.* L AND S CONSTRUCTION ET AL. (14535)

PETERS, C. J., CALLAHAN, BORDEN, KATZ and PALMER, Js.

Argued May 4—decision released June 29, 1993

*Robert V. Cimmino,* for the appellants (named defendant et al.).

*Kimberly P. Massicotte,* assistant attorney general, with whom were *Joseph Rubin,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, and *Robert B. Teitelman,* assistant attorney general, for the appellee (plaintiff).

PETERS, C. J. The principal issue in this appeal is whether monetary penalties imposed for disposal of solid wastes in violation of the applicable environmental statutes were so excessive as to constitute an abuse of discretion. The plaintiff, Timothy R.E. Keeney, the commissioner of environmental protection (commissioner), filed a multicount complaint charging the defendants L and S Construction, Cathy Morsey, Lee B. Morsey and Steven Hinckley (defendants)[1] with the dumping of demolition debris without a permit, at five different sites in Connecticut, in violation of General Statutes §§ 22a-208a (b)[2] and 22a-430[3] and with hav-

[1] The commissioner also brought charges against the owners of the properties, the defendants Leonard F. Ballwig, Nevzat Murtishi, Agman Murtishi and Michael Cherniske. These defendants are not parties to this appeal because, at trial, they entered into a stipulated judgment with the commissioner.

[2] General Statutes § 22a-208a provides in relevant part: "PERMIT FOR CONSTRUCTION, ALTERATION OR OPERATION OF SOLID WASTE FACILITY . . . .

"(b) No solid waste facility shall be built or established and no solid waste facility without a permit to construct shall be altered after July 1, 1971, until the plan, design and method of operation of such facility have been filed with the department and approved by the commissioner by the issuance of a permit to construct, provided, nothing in this chapter or chapter 446e shall be construed to limit the right of any local governing body to regulate, through zoning, land usage for solid waste disposal. The commissioner shall send a written notification of any application for a permit to construct to the chief elected official of each municipality in which the proposed facility is to be located, within five business days of the date on which any such application is filed."

[3] General Statutes § 22a-430, formerly General Statutes § 25-54i, provides in relevant part: "PERMIT FOR NEW DISCHARGE. REGULATIONS.

ing thereby caused pollution in violation of General Statutes § 22a-14 et seq.[4] The trial court found that the defendants had violated each of the statutes as charged, granted injunctive relief to the commissioner, and ordered the defendants to pay a civil penalty of $1,032,800. The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred their appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

RENEWAL. SPECIAL CATEGORY PERMITS OR APPROVALS. LIMITED DELEGATION. GENERAL PERMITS. (a) No person or municipality shall initiate, create, originate or maintain any discharge of water, substance or material into the waters of the state without a permit for such discharge issued by the commissioner. Any person who initiated, created or originated a discharge prior to May 1, 1967, and any municipality which initiated, created or originated a discharge prior to April 10, 1973, for which a permit has not been issued pursuant to this section, shall submit an application for a permit for such discharge on or before July 1, 1987. Application for a permit shall be on a form prescribed by the commissioner, shall include such information as the commissioner may require and shall be accompanied by a fee of twenty-five per cent more than the amount established in regulations in effect on July 1, 1990. On and after July 1, 1991, such fees shall be as prescribed by regulations adopted by the commissioner in accordance with chapter 54. The commissioner shall not issue or renew a permit unless such issuance or renewal is consistent with the provisions of the federal Clean Water Act (33 USC 1251 et seq.)."

[4] General Statutes § 22a-15 provides: "DECLARATION OF POLICY. It is hereby found and declared that there is a public trust in the air, water and other natural resources of the state of Connecticut and that each person is entitled to the protection, preservation and enhancement of the same. It is further found and declared that it is in the public interest to provide all persons with an adequate remedy to protect the air, water and other natural resources from unreasonable pollution, impairment or destruction."

General Statutes § 22a-16 provides: "ACTION FOR DECLARATORY AND EQUITABLE RELIEF AGAINST UNREASONABLE POLLUTION. The attorney general, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may maintain an action in the superior court for the judicial district wherein the defendant is located, resides or conducts business, except that where the state is the defendant, such action shall be brought in the judicial district of Hartford-New Britain, for declaratory and equitable relief against the state,

The trial court's memorandum of decision establishes the following facts. The defendant L and S Construction is a partnership. The acts of the partnership are attributable to the individual defendants, who are either partners or agents of the partnership.

During 1990 and 1991, without having applied for any state permits, the defendants disposed of massive amounts of construction debris at five different sites in the state. One of these sites was their own property in New Milford, while the others were sites on which they deposited waste materials with the consent of the owners.

At their own property at 322 Kent Road in New Milford, abutting the Housatonic River, the defendants buried several thousand cubic yards of waste material on the site, and accumulated more than 51,000 cubic yards altogether. The waste materials constitute an environmental hazard to the site's subsurface water and to the contiguous river.

At 44 Black Bridge Road in Newtown, although the defendants received consent to deposit clean fill, they instead deposited 700 cubic yards of construction debris. The solid waste is within fifty to seventy-five feet of a well, and its leachate will pollute the ground and endanger the water supply at the site.

any political subdivision thereof, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction."

General Statutes § 22a-18 provides in relevant part: "POWERS OF COURT. (a) The court may grant temporary and permanent equitable relief, or may impose such conditions on the defendant as are required to protect the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction."

On Saw Mill Road in Torrington, the defendants dumped 1800 cubic yards of construction debris on the property of a subdivision for which they had contracted to construct a road. Because this solid waste is a danger to the water supply and to the environment, the developers removed it from the site at a cost of $78,000.

On Route 55 in Sherman, the defendants dumped 3000 to 4000 cubic yards of construction debris on property for which they had agreed to dig a foundation hole and to build an access road. These solid waste materials constitute a danger to the water supply in the area and to the environment.

On property in or near a wetland in New Preston, with the unwitting consent of the owner, the defendants dumped 2000 cubic yards of construction debris. These solid wastes constitute a danger to the water supply, to the environment in general and to the wetlands.

The trial court concluded that the defendants had violated three different environmental statutes by their disposal of significant amounts of construction debris at each of these five sites without the necessary permits. First, the defendants' dumping of construction materials contravened the requirements of § 22a-208a regulating the disposal of solid waste. Construction debris falls within the definition of "solid waste." General Statutes § 22a-207 (3).[5] The disposal of more than ten cubic yards of solid waste constitutes the establishment of a solid waste facility; General Statutes

---

[5] General Statutes § 22a-207 (3) provides: " 'Solid waste' means unwanted or discarded solid, liquid, semisolid or contained gaseous material, including, but not limited to, demolition debris, material burned or otherwise processed at a resources recovery facility or incinerator, material processed at a recycling facility and sludges or other residue from a water pollution abatement facility, water supply treatment plant or air pollution control facility."

§ 22a-207 (4) and (6);[6] for which a license is required by § 22a-208a. Second, the defendants' unlicensed discharge of leachate contravened § 22a-430, which forbids the discharge of any substance or material into the water of the state without a permit for discharge issued by the commissioner of environmental protection. Third, the presence of these solid waste materials and the accompanying discharge of leachate into the waters of the state constituted unreasonable pollution in violation of the Environmental Protection Act, § 22a-14 et seq.

Having found that the commissioner had proven these three statutory violations, the trial court issued a permanent injunction enjoining the defendants from dumping future deposits of solid waste anywhere within the state without a permit and requiring their compliance with detailed specifications for the removal of the illegal solid waste previously deposited at each of the sites other than Torrington.[7] The court's order included penalties in the event of noncompliance and indicated that the court would retain supervisory jurisdiction to assure compliance with its mandate.

In addition, pursuant to §§ 22a-208a and 22a-430, the trial court imposed civil penalties of $1,032,800 on the

---

[6] General Statutes § 22a-207 (4) provides: " 'Solid waste facility' means any solid waste disposal area, volume reduction plant, transfer station, wood-burning facility or biomedical waste treatment facility."

General Statutes § 22a-207 (6) provides: " 'Solid waste disposal area' means any location, including a landfill or other land disposal site, used for the disposal of more than ten cubic yards of solid waste. For purposes of this subdivision, 'disposal' means the placement of material at a location with the intent to leave it at such location indefinitely, or to fail to remove material from a location within forty-five days, but does not mean the placement of material required to be recycled under section 22a-241b in a location on the premises of a recycling facility, provided such facility is in compliance with all requirements of state or federal law and any permits required thereunder."

[7] The construction debris had been removed from the Torrington site by the time of the trial.

defendants. The court determined that such penalties were appropriate, in accordance with the criteria outlined in *Carothers* v. *Capozziello,* 215 Conn. 82, 103–104, 574 A.2d 1268 (1990), and General Statutes § 22a-438,[8] because the statutory violations were severe, serious, knowing and flagrant. The court found that the defendants had profited substantially from their illegal conduct, and that they had failed to substantiate their alleged financial inability to pay a fine.

The defendants' appeal raises two issues. They maintain that the judgment of the trial court should be set aside because: (1) there was insufficient evidence of their violation of § 22a-16 of the Environmental Protection Act; and (2) the amount of the civil penalties constituted an abuse of discretion. We are unpersuaded.

I

The defendants' claim of insufficiency of the evidence is a limited one. They do not challenge the trial court's finding that their unlicensed disposal of construction

---

[8] General Statutes § 22a-438, formerly General Statutes § 25-54q, provides in relevant part: "FORFEITURE FOR VIOLATIONS. PENALTIES. (a) Any person who or municipality which violates any provision of this chapter, or section 22a-6 or 22a-7 shall be assessed a civil penalty not to exceed twenty-five thousand dollars, to be fixed by the court, for each offense. Each violation shall be a separate and distinct offense and, in case of a continuing violation, each day's continuance thereof shall be deemed to be a separate and distinct offense. The attorney general, upon complaint of the commissioner, shall institute a civil action in the superior court for the judicial district of Hartford-New Britain to recover such penalty. In determining the amount of any penalty assessed under this subsection, the court may consider the nature, circumstances, extent and gravity of the violation, the person or municipality's prior history of violations, the economic benefit resulting to the person or municipality from the violation, and such other factors deemed appropriate by the court. The court shall consider the status of a person or municipality as a persistent violator. The provisions of this section concerning a continuing violation shall not apply to a person or municipality during the time when a hearing on the order pursuant to section 22a-436 or an appeal pursuant to section 22a-437 is pending."

debris came within, and violated, the permit require-
ments of §§ 22a-208a and 22a-430. They contend,
instead, that the state failed to prove that their activi-
ties constituted unreasonable pollution in violation of
§ 22a-16 of the Environmental Protection Act.

In support of its conclusion that the defendants had
violated the Environmental Protection Act, the trial
court found that, at each of the five sites at issue in
this case, the defendants had deposited construction
debris in close proximity to water resources. At each
site, the leachate from this construction debris con-
stituted an environmental hazard to a river, to the local
water supply or to a wetlands. These findings of fact
would be reversible on appeal only if they were clearly
erroneous. See Practice Book § 4061; *Pandolphe's Auto
Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435
A.2d 24 (1980).

The defendants do not question the trial court's find-
ings relating to their improper disposal of the construc-
tion debris or to the leachate emanating from such
debris. They maintain, however, that the court improp-
erly determined that they had violated § 22a-16 of the
Environmental Protection Act because whatever pol-
lution, impairment or destruction of the environment
resulted from their activities was not shown to have
been unreasonable.[9]

The state's evidence on the adverse impact of the
defendants' activities on the health and well-being of
the community and the environment principally took
the form of expert opinions offered by three environ-

---

[9] The defendants make a subsidiary claim that the trial court mistakenly
assumed that the demolition debris was hazardous waste rather than solid
waste. Although the record indicates some casual usage of the term "haz-
ardous," the trial court consistently and correctly made its findings under
the proper statutes. The court's determination that the demolition debris
was hazardous to local water supplies and to local wetlands is not a find-
ing that the debris fell within the legal classification of hazardous waste.

mental analysts with the department of environmental protection and a director of health for the town of New Milford. The experts testified that the leachate from the defendants' construction debris would pollute nearby subsurface or ground water and surface waters and that pollution of such waters would endanger other persons using the groundwaters as a source of drinking water. There was testimony about a risk of fire hazard and rodent harborage associated with the decomposition of construction debris. Finally, there was testimony that the defendants' disposal activities had impaired the quality of the river adjacent to their own property and had destroyed a portion of the wetlands on the New Preston property.

Although the defendants do not challenge the qualifications of the state's witnesses to give expert opinions on environmental matters, they nonetheless maintain that the trial court could not have relied on these expert opinions because the experts testified in large part on the basis of hypothetical questions rather than on the basis of their own personal observations. The defendants cite no authority in support of this proposition of law, and our law is to the contrary. The established rule is that, on direct examination, the stated assumptions on which a hypothetical question is based must be the essential facts established by the evidence. See *Floyd v. Fruit Industries, Inc.,* 144 Conn. 659, 666, 136 A.2d 918 (1957); *Johnson* v. *Toscano,* 144 Conn. 582, 589–90, 136 A.2d 341 (1957); *Graybill* v. *Plant,* 138 Conn. 397, 403, 85 A.2d 238 (1951); C. Tait & J. LaPlante, Handbook of Connecticut Evidence (2d Ed. 1988) § 7.16.8, pp. 180–81. If the hypothetical question has the proper factual foundation, the expert may give his opinion without having personally verified the accuracy of these assumed facts. See *Shelnitz* v. *Greenberg,* 200 Conn. 58, 67, 509 A.2d 1023 (1986); *Nash* v. *Hunt,* 166 Conn. 418, 425–26, 352 A.2d 773 (1974); *Pischitto* v. *Waldron,* 147 Conn. 171, 176–77, 158 A.2d 168 (1960).

The defendants, therefore, have not shown that the trial court's finding that they violated § 22a-16 of the Environmental Protection Act was clearly erroneous. The trial court's injunctive order is, accordingly, affirmed.

## II

Although the defendants do not contest the trial court's finding that they violated §§ 22a-208a and 22a-430, they claim that the trial court abused its discretion in ordering them to pay civil penalties in the amount of $1,032,800 because of these violations. The trial court arrived at the amount of the civil penalties by separately assessing a fine of $200 per day, under each statute, for the violations at each of the five sites at which the defendants had illegally deposited demolition debris.[10]

In making its assessment, the trial court appropriately relied on the guidelines defined in *Carothers* v. *Capozziello,* supra, and § 22a-438 (a). For violations of § 22a-208a, the *Carothers* guidelines require the trial court to exercise its discretion by conducting an inquiry including, but not limited to, the following factors: "(1) the size of the business involved; (2) the effect of the penalty or injunctive relief on its ability to continue operation; (3) the gravity of the violation; (4) the good faith efforts made by the business to comply with applicable statutory requirements; (5) any economic benefit gained by the violations; (6) deterrence of future violations; and (7) the fair and equitable treatment of the regulated community." Id., 103–104. Similarly, for violations of § 22a-430, the § 22a-438 (a) guidelines direct the court to consider "the nature, circumstances,

---

[10] The penalty was assessed, under each statute, in accordance with the trial court's findings that the defendants' continuing violations had occurred as follows: New Milford, 649 days; Sherman, 639 days; New Preston, 636 days; Newtown, 606 days; and Torrington, 89 days.

extent and gravity of the violation, the person or municipality's prior history of violations, the economic benefit resulting to the person or municipality from the violation, and such other factors deemed appropriate by the court."

In conformity with these guidelines, the trial court made the following findings. The defendants' violations were "severe and extremely serious. Not only did the defendants dump toxic demolition debris near water supplies at the various sites but also dumped it next to the Housatonic River in New Milford in huge quantities. The 51,000 cubic yards of waste at that site were buried over a 2 acre area up to 18 feet deep. They totally dumped over the five sites in excess of 58,000 cubic yards of waste. Of further significance is that much of this dumping occurred after the defendants were told by the authorities that they were violating the law." The defendants made substantial profits as a result of their illegal dumping, not only because they entered into profitable contracts for the illegal disposal of demolition debris but also because they did not incur the costs associated with lawful disposition. They had profited from a contract to transport and dump demolition material from New York at $8 per cubic yard and they had saved the costs of proper disposition in an amount "in excess of $1,000,000." The court further noted that, in assessing penalties against the defendant, it had considered the effect of the fine on future violations by these defendants.

The court expressly inquired into the defendants' ability to pay a substantial fine. In part, this inquiry was grounded in the court's initial findings about the size of the defendants' business. The court determined that the defendants were actively engaged in the demolition business, having grossed at least $269,000 in the first six months of 1991. They owned the land and the buildings in New Milford, as well as "six large trucks

and additional equipment." The court noted that the defendants had offered no credible evidence about their inability to pay any fine except for the testimony of one of the defendants that the partnership "had contacted a bankruptcy attorney because of its financial problems."

The defendants challenge the trial court's findings in several respects. Significantly, they do not contest the considerable number of days that the court found them to have violated the statute at each of the five sites at which they illegally disposed of demolition debris. They maintain, however, that the court improperly: (1) ignored testimony about their financial circumstances; (2) found that 51,000 cubic yards of waste had been deposited at the New Milford site;[11] (3) overlooked their attempts at remediation; (4) calculated the benefits they had received from their statutory violations; and (5) imposed a penalty in addition to ordering them to remove the debris. We are not persuaded.

The defendants presented only one witness to testify about their financial ability to pay a penalty. That witness was the defendant Cathy Morsey, the manager of the defendant partnership. Although she testified on direct examination that the company was under severe financial stress, on cross-examination she acknowledged that she had little or no direct knowledge of the underlying financial data, inasmuch as the figures upon which she relied had come from a bookkeeper who was no longer in the company's employ. In these circumstances, the court was not required to attribute persuasive weight to her testimony. We agree with the commissioner that, especially after flagrant

---

[11] The defendants claim that the trial court made an improper factual finding because it allegedly adopted the representation of the commissioner, at trial, that "this case involves the largest amount of dumping of hazardous waste in the State's history." Nothing in the memorandum of decision substantiates the proposition that the court made such a finding.

and knowing statutory violations have been shown, the trial court may place the burden of establishing mitigating financial circumstances on the defendants. See *Chesapeake Bay Foundation* v. *Gwaltney of Smithfield,* 791 F.2d 304, 315–16 (4th Cir. 1986); *Public Interest Research Group* v. *Powell Duffryn Terminals, Inc.,* 720 F. Sup. 1158, 1165–66 (D.N.J. 1989).

The defendants challenge the court's finding about the extent of their dumping activities at the New Milford site. Specifically, the court found that "51,000 cubic yards of waste at that site were buried over a 2 acre area up to 18 feet deep." The defendants' contention that no evidence was adduced to support the finding cannot prevail in light of the testimony of Peter Carpenter, a field inspector of the department of environmental protection engineering enforcement division, solid waste unit. On the basis of test borings performed at the site, Carpenter testified that demolition debris had been buried over a two acre area up to sixteen to eighteen feet deep. With the appropriate conversion into cubic yardage, this evidence substantiates the court's finding.[12]

The defendants' contention that the court ignored their attempts to remedy their illegal use of the New Milford site cannot be sustained. Not only did they fail to ask the trial court to articulate what role such attempts might have played in its decision; see Practice Book § 4051; but they overlooked substantial evidence in the record that shows that their activity continued long after the department of environmental protection had notified them of its illegality.

The defendants also argue that the trial court lacked a factual foundation for its findings about the economic

---

[12] An acre consists of 4840 square yards. Two acres consist of 9680 square yards. At a depth of sixteen feet, or 5.33 yards, the site contained 51,626 cubic yards of debris.

benefits that they had received from their illegal disposal activities. We disagree. The defendants have offered no tenable challenge to the trial court's findings that they dumped nearly 60,000 cubic yards of demolition debris without incurring the costs of licensed disposal. Accepting the expert testimony of Thomas Pregman, the trial court could reasonably have found that the defendants saved more than $1,000,000 by their illegal disposal. The court could equally have inferred that the defendants received an unwarranted profit from a contract in which they were paid for disposing of unwanted waste materials,[13] when that profit would have reflected their failure to assume the costs legally associated with such disposal.

Finally, we reject the defendants' contention that the court did not have the discretion to impose both a removal order and a civil penalty in the circumstances of this case. The governing statutes do not forbid the trial court to order cumulative remedies. Indeed, as the commissioner points out, a remedy limited to the costs of removal would not achieve the primary purpose of civil penalties, which is deterrence. See, e.g., *United States* v. *T & S Brass and Bronze Works, Inc.*, 681 F. Sup. 314, 322 (D.S.C. 1988); *United States* v. *Phelps Dodge Industries, Inc.*, 589 F. Sup. 1340, 1365 (S.D.N.Y. 1984).

The judgment is affirmed.

In this opinion the other justices concurred.

---

[13] The trial court's finding must stand, despite the testimony of the defendant Cathy Morsey. Her testimony on this issue was neither dispositive nor did the court have to find it credible.